Daniel KUNIN, Plaintiff,

v.

**BENEFIT TRUST LIFE INSURANCE COMPANY, Defendant.**

No. CV 87–3715–IH.

United States District Court,
C.D. California.

Sept. 19, 1988.

Gage, Mazursky, Schwartz, Angelo & Kussman by Richard H. Rabkin, Beverly Hills, Cal., for plaintiff.

Booth, Mitchel & Strange by Robert F. Keehn, Los Angeles, Cal., for defendant.

## OPINION

IRVING HILL, District Judge.

 In this opinion the Court, in an apparent case of first impression, decides that autism is not a "mental illness" within the

meaning of an exclusionary clause in a group health and medical insurance policy.

## FACTS

Jurisdiction of the Court is invoked under ERISA (29 U.S.C. § 1132). In 1986, plaintiff Daniel Kunin was covered under a group health and medical insurance policy issued to his employer by the defendant Benefit Trust Life Insurance Company. The parties agree that the policy itself is an "employee welfare benefit plan" under 29 U.S.C. § 1002(1). Defendant insurance company is both the writer of the policy and the administrator of the plan.

During 1986 plaintiff's dependent son, Alex Kunin, was hospitalized for about 30 days at the UCLA Neuropsychiatric Institute. Alex was diagnosed there as suffering from "organic brain dysfunction ... and syndrome of autism secondary to the first diagnosis." That diagnosis is not disputed. Both sides characterize the diagnosis as one of autism.[1] The plaintiff incurred bills for this hospitalization and treatment in the amount of $54,696.96 and submitted a claim to the defendant in that amount.

The defendant's policy contains a limitation which limits medical benefits for "mental illness or nervous disorders" to a maximum of $10,000 in any calendar year. Defendant rejected the portion of the claim over $10,000, relying exclusively on the assertion that autism is a "mental illness" within the meaning of the policy.[2] Pursuant to this position defendant paid only $10,000 of plaintiff's claim and refused to pay the remainder. This action followed.[3] Plaintiff invokes the remedy provided for in 29 U.S.C. § 1132(a)(1)(B), and seeks to recover $44,696.96, the unpaid portion of his expenses, plus attorneys fees.

The action was tried as a court trial. This opinion is meant to constitute the Court's findings of fact and conclusions of law as well as a full statement of the Court's reasoning. The case appears to be one of first impression. No prior reported opinion has been cited to the Court, and the Court has found none, which construes an identical policy limitation clause or defines the term "mental illness" in a similar context.[4]

Much of the trial concerned itself with expert testimony as to the definition and description of autism and its etiology. That testimony establishes the facts set forth below.

The syndrome of autism falls within the category of pervasive developmental disorders. The syndrome is defined by its symptoms. The essential features are a lack of responsiveness to other people, gross impairment in communicative skills, and bizarre responses to various aspects of the environment (e.g. resistance to change or peculiar interest in or attachments to certain objects). These symptoms usually appear within the first 30 months of life. In the medical community autism is generally treated by child psychiatrists.

1. In accordance with undisputed expert testimony in the case, thoughout this opinion the terms "syndrome of autism" and "autism" are used as synonyms. Autism is termed a "syndrome" because it is defined solely by its symptoms, i.e., its behavioral manifestations.

2. Defendant abjured any reliance on the "nervous disorders" portion of the policy limitation. Undisputed expert testimony at the trial established that the term "nervous disorder" is quite archaic and has no ascertainable meaning in modern usage.

3. This action was originally brought in the Superior Court of Los Angeles County, alleging several California statutory and common law causes of action, and was removed to this Court by defendant. Following removal, the parties stipulated that the group insurance policy in issue is an "employee welfare benefit plan" under ERISA. The parties also stipulated that this action was brought solely under ERISA, 29 U.S. C. § 1132, and that all state law causes of action were preempted.

4. One somewhat similar holding exists. In *Arkansas Blue Cross & Blue Shield v. Doe*, 22 Ark.App. 89, 733 S.W.2d 429 (1987), an intermediate appellate court held that bipolar affective disorder is a physical illness within the coverage section of an insurance policy and is not a "mental, psychiatric or nervous condition" within a limitation provision of the policy. The case did not involve ERISA. However, the holding seems in accord with this Court's present holding since it emphasizes physical causation of that illness and its origin within the brain.

Two definitions of autism appear in publications of the American Psychiatric Association. The shorter, more concise definition is contained in its *Psychiatric Glossary* (1984). Autism is defined there as follows:

> "A *developmental disability* caused by a physical disorder of the brain appearing during the first three years of life. Symptoms include disturbances in physical, social, and language skills; abnormal responses to sensations; and abnormal ways of relating to people, objects and events." *Id.* at 11 (italics in original).

A much longer and more involved definition is contained in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders III* (1980). That multi-page definition is largely a description of the symptoms.

The expert testimony established that the two definitions are consistent with each other and are consistent with the Court's description of the illness *supra*.

Although the precise etiology of autism remains unknown, medical research has produced increasingly strong evidence of a demonstrable organic basis for the syndrome. Specifically, significant physical changes and dysfunctions which accompany autism have been identified within the brain. Experts in the field consider the syndrome of autism to be the behavioral expression of these underlying organic dysfunctions. This current understanding of the syndrome explains the dual diagnosis of Alex Kunin's illness at UCLA—i.e., "organic brain dysfunction" and autism "secondary" thereto. Where the physical cause of a medical condition is known, the behavioral symptoms are viewed as "secondary" to the physical cause.

Research into the causes of autism has also led to the conclusion that the syndrome is not environmentally or psychologically based. There is a consensus among experts that the syndrome of autism is not caused by environmental trauma or childhood relationships with parents or others. It is clear that autism cannot be treated by traditional psychotherapy.

## MERITS

The Court, at the threshold, must consider the proper standard of judicial review applicable to the instant case. Under the rules generally applied by appellate courts, a plaintiff seeking reversal of a decision of an ERISA plan administrator concerning entitlement to benefits must bear a substantial burden. Such a plaintiff must establish that the decision to deny benefits was arbitrary and capricious, or made in bad faith, or not supported by substantial evidence, or erroneous as a matter of law. That standard of review has been most recently enunciated by the Ninth Circuit in *Johnson v. District 2 Marine Engineers Beneficial Association*, 857 F.2d 514 (9th Cir.1988). In the instant case, recognizing that he may have to meet the *Johnson* standard, plaintiff has asserted alternatively that the administrator's decision as to his claim was arbitrary and capricious and/or made in bad faith.

The *Johnson* opinion refines somewhat the "arbitrary and capricious" concept. It holds that "a decision is not arbitrary or capricious if it is based on a reasonable interpretation of the plan's terms and was made in good faith". 857 F.2d at 516. That is plaintiff's approach, as well, in this case. Though he has phrased his claim as a claim of arbitrariness and capriciousness, he asserts simply that defendant's interpretation of the policy was not a reasonable one.

It seems to the Court that there are strong public policy considerations in the instant case which would dictate a burden of proof requirement for the plaintiff less rigorous than the *Johnson* standard. The normal situation is one in which the plan has been formulated by negotiations between labor and management and is administered under a system in which both sides are represented in the administration or in the choice of an administrator. In that type of situation, care is taken to insure that the plan administrator is impartial, objective and has no fiscal stake in any of his interpretations or other actions. *Johnson* was just such a case. The plan there was jointly administered by a board of

trustees composed of multiple employer and union representatives.

There are a few cases which have applied a lesser standard and lesser requirement of proof in situations where the plan administrator is not entirely impartial or objective and may have a vested interest in denying benefits. The Ninth Circuit has held that less deference should be afforded to the decisions of a plan administrator who is also a senior management official of the employer than is given to the decisions of an independent administrator, where the decision involves an outlay of funds by the employer. *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1152 (9th Cir.1986); *Jung v. FMC Corp.*, 755 F.2d 708, 711–712 (9th Cir.1985.)

It would seem that the *Dockray* and *Jung* rationale is also applicable to the instant situation where the administrator, though not a management employee, is the insurer itself. The administrator here faces the same kind of conflict of fiscal interest which motivated the Ninth Circuit in *Dockray* and *Jung* to weaken the normal deference rule.

In the instant case not only does the administrator have a profit motive, a benefit to itself, in denying a claim, it is also an insurance company interpreting a standard insurance policy which it wrote and issued in return for a premium. It could be argued with some force that rather than requiring a showing of "arbitrary and capricious" conduct or lack of good faith, reversal of the administrator's decision, in a situation like this, should be allowed under standards akin to those employed in other litigation between an insurer and an insured. Those standards are well known and well established, i.e., any ambiguity or uncertainty in the policy will be construed against the insurer in order to achieve the object of coverage for the losses to which the policy relates. 1 Witkin *Summary of California Law*, 9th Ed. 632, Contracts § 639. Along the same line, the law is settled that language of coverage in a policy will be construed in the most inclusive sense for the benefit of the insured and language of exclusion will be reciprocally

be construed in the most restrictive sense. *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 808, 180 Cal.Rptr. 628, 632, 640 P.2d 764, 768 (1982).

This Court finds it unnecessary, however, to decide whether a different standard of review should be applied under the special circumstances of this case. The Court reaches its result in the instant case, one favorable to the plaintiff, by applying the *Johnson* standard for ERISA cases.

Turning to the question at bar, one preliminary question must be addressed. The words in issue in this case, "mental illness", can conceivably be characterized as a scientific or technical term. The Court must therefore decide whether the words should be given an exclusively scientific or technical definition (i.e., a definition that would be employed by the scientific and technical community which deals with the field of inquiry) as opposed to a "lay" definition.

■ The Court has determined to reject a scientific or technical definition. One cannot ignore the fact that the words in question were used in an insurance policy which was written by non-scientists, approved by non-scientist insurance commissioners, and purchased by lay persons for the protection of lay persons.

It has been long-established that insurance policy language and terms should be construed in accordance with the plain and ordinary meaning that a lay person would ordinarily attach to them rather than in their technical sense. 2 *Couch on Insurance* § 15:17 (2d. ed. 1984); *Franceschi v. American Motorists Insurance Co.*, 852 F.2d 1217 (9th Cir.1988). In this Court's view, the policy term in question here should also be given the plain and ordinary meaning that a lay person would ordinarily attach to it.

■ Before offering any definition for the words "mental illness", plaintiff contended that the Court should determine that that term is a meaningless one, and therefore the Court should strike the limitation clause and disregard it entirely. In support plaintiff offered expert testimony

that "mental illness" is a term that has no precise meaning among medical and research experts, and would not be used by professionals in the field to precisely delineate *any* category of medical conditions. Despite this evidence, it seems to the Court that the term can be given a plain and ordinary meaning, sufficient as generally applied by lay persons, to distinguish particular medical conditions from others. In other words, the term is susceptible of a lay definition despite its lack of an accepted precise technical meaning. Plaintiff's request to strike the limitation clause as meaningless is thus rejected.

Each side proposed different definitions of the term "mental illness" as used by lay persons. Plaintiff's expert witnesses, Drs. Edward Ritvo and Betty Jo Freeman,[5] testified that "mental illness" refers to a behavioral disturbance with no demonstrable organic or physical basis. Along the same line, they testified that a mental illness stems from reaction to environmental conditions as distinguished from organic causes. Thus, plaintiff's experts concluded, autism would clearly fall outside the aforesaid criteria and factors for mental illness. Both of plaintiff's expert witnesses were clear, authoritative and entirely convincing in their testimony.

Defendant's expert witness, Dr. Marvin Gillick,[6] suggested two different definitions of mental illness. One was the definition of a different term, "mental disorder" as found in the American Psychiatric Associa-tion's *Psychiatric Glossary*.[7] That definition was:

"an illness with ... impairment in functioning due to a social, psychologic, genetic, physical/chemical, or biologic disturbance.... The illness is characterized by *symptoms* and/or impairment in functioning." *Id.* at 89 (italics in original).

The *Psychiatric Glossary* definition could include almost every imaginable physical disorder including cancer, glaucoma or a broken leg. It would include many conditions which no lay person would ever remotely consider to be mental illnesses. The glossary definition cannot be viewed as a serious or intelligible effort to differentiate mental illness from other types of medical conditions.[8] The Court rejects it as unreasonable on its face.

[■] Dr. Gillick's second proposed definition was "an aberrant behavior syndrome or manifestation which has its basis in the neurological axis and/or central nervous system, but whose precise etiology is uncertain." (Gillick, *Depo.* at 21) This definition, with its emphasis on the *precise etiology* being unknown, must also be rejected. If the general nature of the cause of an illness is known and the cause is organic, the illness should not be encompassed within the term "mental illness" merely because of a lack of precision in the understanding of its causation.

[■] The Court finds that the definition offered by plaintiff corresponds to the general lay understanding of the term "mental

5. Both are professors at the UCLA School of Medicine. Their research and clinical practices have focused on autism for many years. Each has published extensively in the field. Dr. Ritvo has authored, alone or with others, over 100 papers on autism in professional journals and texts. He is generally recognized as the world's foremost authority on autism, its etiology and its treatment.

6. Dr. Gillick is a Clinical Associate Professor of Psychiatry at the USC School of Medicine. He has had minimal clinical experience with autism and has done no research in the field. He did not claim to be an expert on autism.

7. The glossary did not specifically define "mental illness". Instead, the mental illness entry

merely instructed the reader to "see mental disorder" without stating whether the two terms were viewed as synonyms.

8. In an attempt to buttress its claim that the glossary definition of mental disorder should be adopted by the Court as its definition of mental illness, defendant pointed to the fact that autism is listed in the *Diagnostic and Statistical Manual of Mental Disorders III* at 87–90. That publication is clearly intended to provide diagnostic categories for use by medical professionals. Its use for other purposes would not be justified. As the *Manual* itself says, "the use of this manual for nonclinical purposes, such as determination of legal responsibility ... or justification for third-party payment, must be critically examined in each instance within the appropriate institutional context." *Id.* at 12.

illness", especially in conjunction with other factors emphasized by plaintiff's experts.

As the evidence indicates, mental illness is often thought of by lay persons as having nonphysical, psychological causes, in the Freudian sense, as opposed to an organic basis. Where dysfunctions of the brain derive from an identifiable organic basis, as in the case of brain cancer or Alzheimer's disease, the condition would not commonly be understood as mental illness. A related factor which can distinguish mental illnesses is their causation by environmental factors, such as traumatic experiences or childhood relationships. Autism exists throughout the world. It is not caused by environmental factors and it is unaffected by manipulation of environments. Its incidence and characteristics remain constant across socio-cultural environments.

Another important factor tending to place autism outside the ambit of "mental illnesses" is the nature of its treatment. Autism cannot be treated with any of the traditional methods of psychotherapy.[9] Such treatability and methods of treatment, i.e., psychotherapy, are certainly the methods which would be primarily associated, in the minds of the lay public, with the problem of "mental illness".

■ To summarize, the Court concludes that defendant's inclusion of autism within the limitation clause covering "mental illness" was not a reasonable interpretation of the contract and the plan. As a result, defendant has arbitrarily and capriciously denied plaintiff's claim for benefits in violation of 29 U.S.C. § 1132, and is liable to plaintiff for those unpaid benefits plus prejudgment interest.

If, *arguendo*, it is held that the term "mental illness" must be given a scientific or technical meaning, the Court would reach the same result. Plaintiff's experts testified persuasively that they and their colleagues would not use the term "mental illness" in connection with developmental disorders such as autism, and that professionals in that field would not generally consider autism a mental illness. Autism would more appropriately be referred to by scientific professionals as a disease or disorder of the brain. Thus it would be unreasonable to classify autism as a mental illness even giving that term an exclusively scientific or technical meaning.

## ATTORNEYS FEES

■ In an action to recover benefits due under an ERISA plan, attorneys fees may be awarded at the Court's discretion. 29 U.S.C. § 1132(g)(1). The factors to be considered in exercising this discretion were enumerated in *Hummell v. S.E. Rykoff & Company*, 634 F.2d 446, 453 (9th Cir.1980), as follows:

> "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions."

With regard to factors (1) and (5), the Court finds that defendant did not act in bad faith, and the relative merits did not tilt overwhelmingly in plaintiff's favor. The listing of autism in various books relating to psychiatry and mental disorders could lead one to a superficial conclusion that autism was a mental illness. There were no additional indicia of bad faith behavior on the part of defendant. Factor (4), seeking to benefit all beneficiaries, is inapplicable to this action. As to factor (3), only a minimal deterrent effect would be achieved by a fee award in this case, and in light of the absence of bad faith, this factor is not sufficient to justify a fee award. Having considered the relevant guidelines,

---

**9.** There is no cure for autism. At present, the treatment consists of a combination of medication, to control the physical problem to a limited extent, and special education to help the patients make use of their strengths and function around their weaknesses.

the Court declines to exercise its discretion to award fees in this case.

A separate judgment will be entered in accordance with this opinion.