730 F.Supp. 292 (1989)
Robert P. BREWER, Natural Guardian and Duly Appointed Next Friend of Robert C. Brewer, Plaintiffs,
v.
LINCOLN NATIONAL LIFE INSURANCE COMPANY, Defendant.
No. 88-1987 C(3).
United States District Court, E.D. Missouri, E.D.
October 6, 1989.
Amended November 20, 1989.
Robert L. Devereux, Joseph F. Devereux, Jr., Guilfoil, Petzall & Shoemake, St. Louis, Mo., for plaintiffs.
*293 Clark H. Cole, Armstrong Teasdale Schlafly Davis & Dicus, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiffs' claims after a one day bench trial.
Pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., plaintiffs seek equitable relief,[1] $55,912.87 in damages, interest, attorney's fees, and costs for defendant's allegedly improper failure to pay benefits under health insurance policies issued by defendant pursuant to an employee health plan provided by plaintiff Robert P. Brewer's employer. Defendant asserts that it is not liable for the payment of any additional expenses incurred during the relevant hospitalizations. In particular, the parties dispute whether charges for in-hospital care of severe affective mood disorder fall under the broad major medical benefits provision of the policies.
Having fully considered the pleadings, depositions, stipulations, evidence, and the entire record herein, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Robert P. Brewer ("Robert Brewer") at all times material herein was a citizen of the State of Missouri and the County of St. Louis. Robert Brewer is the father, natural guardian, and duly appointed next friend of plaintiff Robert C. Brewer ("Rob Brewer"), a minor and a dependent of Robert Brewer.
2. Defendant Lincoln National Life Insurance Company ("Lincoln") at all times material herein was a corporation duly existing under and by virtue of the laws of the State of Indiana, with its principal place of business in the State of Indiana, and is authorized to conduct business in the State of Missouri.
3. At all relevant times, plaintiffs were covered by an insurance plan provided by Robert Brewer's employer under which group health insurance policies were issued and administered by defendant Lincoln. In January 1988, defendant Lincoln stopped providing health insurance for Robert Brewer's employer.
4. The relevant insurance policies provide liberal benefits for charges by a hospital for board and room, medical services and supplies, and fees of legally qualified physicians and surgeons for medical care or treatment ("major medical expense provisions"). The policies also provide only limited coverage for charges for treatment of mental illness and of functional nervous disorders or nervous conditions of any type or cause ("mental illness provisions"). The first insurance policy also provides that charges for "psychiatric or psychoanalytic care for any reason" are encompassed by the mental illness provision.
5. The parties stipulated that the disputed charges would fall within and be fully paid under the major medical expense provisions of the policies were it not for the limitations of the mental illness provisions.
6. The mental illness provision in the first relevant insurance policy states:

Mental Illness, Substance Abuse and Alcoholism Charges for treatment of mental illness(es), functional nervous disorder(s) of any type or cause, substance abuse, alcoholism, or for psychiatric or *294 psychoanalytic care for any reason are covered as follows:
1. hospital charges for a maximum of 40 days of confinement in any one calendar year, and
2. charges by a legally qualified physician to a maximum payment of $30 per visit, limited to a maximum payment of $3,000 in any one calendar year.
(The word "VISIT" includes each attendance of the physician to the patient, regardless of the type of professional services rendered, whether it might be otherwise termed consultation, treatment, or described in some other manner.)
That policy also provides that there is a "$50,000 maximum with respect to charges in connection with mental illness and substance abuse." The only definition in this policy states that:
"Illness" or "Sickness" means a bodily disorder or disease, pregnancy, mental infirmity or bodily injury.
Otherwise, this policy does not contain a specific definition of "mental illness" or of "psychiatric care." Nor does this policy incorporate or adopt any other references to define those terms.
7. The mental illness provisions in the second relevant insurance policy provide as follows:
MAJOR MEDICAL LIMITATIONS
The maximum payment for care of mental illness, nervous conditions of any type or cause, substance abuse or outpatient treatment of alcoholism, by a doctor will not be more than $30.00 for each visit with a maximum of $3,000 in any one calendar year.
(A "visit" occurs each time the doctor provides care to the patient.)
Maximum Covered Charge for Room and Board
* * * * * *
For treatment of mental illness or substance abuse, charges are limited to a maximum of 40 days of hospital confinement in any one calendar year.
The policy also states that there is a $50,000 maximum (lifetime aggregate) benefit "for charges for mental illness(es), substance abuse or outpatient treatment of alcoholism."
This policy, unlike the earlier policy, contains a section on definitions. This section defines "illness" as "1. A disorder or disease of the body or mind; or 2. An accidental bodily injury; or 3. Pregnancy." This section does not contain a definition for "mental illness" or for "nervous conditions of any type or cause." Nor does this policy incorporate or adopt any other references to define those terms.
8. Rob Brewer was hospitalized on three separate occasions. The first hospitalization took place on October 6, 1986, and lasted until December 22, 1986. The second hospitalization began on January 28, 1987, and lasted until April 4, 1987. The third hospitalization began on August 1, 1987, and lasted until October 9, 1987.
9. During each hospitalization, Rob Brewer was treated based upon diagnoses of severe affective mood disorder. His primary physician during these hospitalizations was Felix LaRocca, M.D., a psychiatrist who is board certified in psychiatry and child psychiatry. The care included the administration and monitoring of prescription medications (lithium bicarbonate and Nardil) along with psychotherapy sessions and meetings with the family.
10. The charges for these hospitalizations were paid in full to the extent permitted by the mental illness provisions of the insurance policies. The parties agree that the hospital and doctor bills for Rob Brewer's treatment during the hospitalizations at issue here are reasonable and that the treatment rendered was reasonably necessary to treat Rob Brewer's condition.
11. The charges not paid by defendant total $55,912.87, with $31,240.38 of that amount falling within the provisions of the first insurance policy, and $24,672.49 of that amount falling within the provisions of the second insurance policy. The disputed charges are for Dr. LaRocca's services, the psychiatric unit at the hospital, medications administered by Dr. LaRocca, and the psychologist's services.
*295 12. Dr. LaRocca described Rob Brewer's diagnosed disorder as a hereditary disease characterized by a disturbance of catecholamines in the brain which produces a symptom of depression in some cases such as this one. While Dr. LaRocca characterized the etiology of this disorder as "uncertain," he stated it was possibly a derangement of neurotransmitters in the brain.
13. Dr. LaRocca reported the treatment for such a disorder is primarily medication and secondary psychotherapy. This was the treatment provided to Rob Brewer and is considered by Dr. LaRocca to be "psychiatric treatment."
14. Dr. LaRocca consistently espouses the position that insurance companies should not differentiate in coverage between certain psychiatric care expenses and other major medical expenses. Although he had not read the language of the insurance policies at issue here, Dr. LaRocca opined that "affective mood disorder is not a mental illness or functional nervous disorder within the meaning of the exclusion set forth in the [relevant] group insurance plan." While these matters detract from the weight to be given Dr. LaRocca's testimony with respect to whether or not the charges at issue here are covered by the relevant insurance policies, they do not detract from the weight to be accorded his expert testimony regarding the basis of the disease and the treatment given to Rob Brewer.
15. Duane Hagen, M.D., a psychiatrist who is board certified in psychiatry, acknowledged that the precise etiology for mood disorders, such as those Rob Brewer had, is unknown but is increasingly being shown as having a biological or genetic basis. These mood disorders encompass severe mood changes where the person is unable to think or concentrate, has thoughts of suicide, and has negative thoughts. Treatment of severe mood disorders includes the use of antidepressant and other mood-stabilizing medications, as well as electro-convulsive therapy, if deemed appropriate.
16. To Dr. Hagen, the phrase "mental illness" encompasses any kind of emotional upset or distress including disorders.
17. Upon analysis of the available records, and without examining Rob Brewer personally, Dr. Hagen opined that Rob Brewer had a primarily depressive or unipolar mood disorder that was treated properly and reasonably. To Dr. Hagen, the treatment provided to Rob Brewer was "psychiatric treatment" which has as its essence the proper diagnosis and use of medications along with adjunctive counselling.
18. Thomas Harris, M.D., a psychiatrist who is board certified in psychiatry, described affective mood disorders as having symptoms which affect a person's behavior, mood, and thinking processes, and as having, in some instances, an origin in inherited biological abnormalities. Dr. Harris included bipolar disorders, schizo-affective disorders, and major severe depressive disorders as in the latter group. Based on the available records and without personally examining Rob Brewer, Dr. Harris opined that Rob Brewer had a severe mood disorder which was an inherited vulnerability that caused problems through "abnormalities in brain and body chemistry and physiology, and which [has] secondary psychological and behavioral symptoms." Thus, Dr. Harris concluded Rob Brewer had a biological, rather than a mental, illness, although he did not clearly define "mental illness."
19. Dr. Harris distinguished the treatment for these illnesses as follows:
The primary type of treatment that works for mental disorders is ... some form of relearning experience.
For biological disorders, it's important to stabilize the biological abnormality and this requires, generally, biological treatment.
Here, Dr. Harris noted, the primary course of treatment was the use of medications to stabilize Rob Brewer's "abnormal mood state and his marked and severe mood changes." Then, Dr. Harris acknowledged, psychotherapy group interaction, family involvement, and psychosocial therapies were *296 used to assist the effectiveness of the medicinal treatment. For Dr. Harris, the professional change in treatment methods, from primarily psychotherapeutic to primarily biological (such as medicines and electroconvulsive therapy) interventions reflects the presently accepted concept that these disorders have a biological basis, despite the fact the precise origin is not yet known. Dr. Harris further noted that counselling is provided to patients with diabetes and other chronic illnesses.
20. There is no evidence of record that Rob Brewer's disorder stemmed from a traumatic experience or from a parental relationship.
21. Thus, the available expert testimony establishes there is a biological basis for the disorder affecting Rob Brewer, even though the exact etiology of the disorder is not yet known.
22. On November 24, 1987, defendant denied plaintiffs' request for coverage of the expenses incurred during the third hospitalization.

Conclusions of Law
A. This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1332 and 29 U.S.C. § 1132(f).
B. Venue before this Court is appropriate pursuant to 29 U.S.C. § 1132(e)(2).
C. The insurance policies at issue here are "employee welfare benefit plans" pursuant to 29 U.S.C. § 1002(1)(A).
D. Plaintiffs are participant in and beneficiaries of the plans at issue here. 29 U.S.C. § 1002(7) and § 1002(8).
E. In relevant part, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., provides that "[a] civil action may be brought ... by a [plan] participant or beneficiary ... to recover benefits due ... under the terms of [the] plan, to enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). In such actions, actions like this one, "a denial of benefits ... is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, ___ U.S. ___, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Under this standard, the Court construes the terms of the plan "without deferring to either party's interpretation." Id. 109 S.Ct. at 955.
Here, there is no contention that the relevant plan gives defendant discretionary authority to determine eligibility for benefits or to construe the terms of the plans. Accordingly, the Court will review the terms of the plans without giving deference to either side's position.
F. Where, as here, none of ERISA's provisions addresses the issues presented in the case, state law may be used for guidance in ascertaining the principles applicable to the ERISA action. Lyman Lumber Co. v. Hill, 877 F.2d 692, 693 (8th Cir.1989) (court may look to state law to fashion federal common law principles applicable to an ERISA case); Rockney v. Blohorn, 877 F.2d 637, 643-44 (8th Cir. 1989) (court may look to appropriate state contract law to govern the interpretation and enforcement of employer benefit plans so long as application of that law would not be contrary to ERISA's provisions).
G. Here, there is no dispute that the contested charges would be covered by and fully paid under the major medical expense provisions of the relevant policies if the limitations of the policies' mental illness provisions did not exist. Thus, the issue is whether or not the policies' mental illness provisions apply to the disputed charges. Provisions restricting coverage are construed in favor of the insured and against the insurer, who has the burden of clearly and unambiguously expressing its intent to exclude. Citizens Ins. Co. v. Kansas City Commercial Cartage, Inc., 611 S.W.2d 302, 307 (Mo.App.1980) (per curiam). Plain and unambiguous language in an insurance contract must be given its plain meaning. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 623 (8th Cir.1981) (applying Missouri law). Any ambiguity is resolved *297 in favor of the insured. Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo.1982) (en banc). Policy language is ambiguous if it is reasonably open to different construction. Id. Finally, the policy language must be viewed in light of the meaning understood by the lay person who obtained the policy. Id.
H. Upon consideration of the mental illness exclusionary language in the policy applicable to the first two hospitalizations, the Court is persuaded that the disputed charges (totalling $31,240.38) fall within the exclusion as "[c]harges for ... psychiatric ... care for any reason." Whether the Court relies on the credible expert testimony, which characterized the care given to Rob Brewer as "psychiatric care," or looks for the plain and ordinary meaning of that phrase, the result is the same. In Simons v. Blue Cross & Blue Shield, 144 A.D.2d 28, 536 N.Y.S.2d 431 (1989), the New York Supreme Court, Appellate Division, found that "[t]he plain, ordinary meaning of `psychiatric' care is the sort of treatment, such as electroshock therapy and psychotropic medication, rendered to a patient who has been admitted to a psychiatric ward in order to attend to his or her psychiatric disorder." Id. 536 N.Y.S.2d at 434. This Court concurs with that New York court's assessment of "psychiatric care."
Accordingly, the Court finds defendant properly denied payment of $31,240.38 in charges incurred for the first two hospitalizations at issue here.
I. The "psychiatric care" language is not in the second policy which covered the third hospitalization. With respect to the disputed charges (totalling $24,672.49) incurred during the third hospitalization, defendant relies on the policy language which excludes "[c]harges for treatment of mental illness(es)."
J. The relevant definition in the policy, the definition of illness, only serves to render more ambiguous the phrase "mental illness" since the definition itself encompasses "mental infirmity." Thus, in and of itself, the insurance policy does not shed light on the interpretation of this phrase.
K. The record does not provide an expert's definition of the phrase "mental illness." Indeed, one expert opined the phrase encompasses any type of emotional distress. Such a description does not serve to clarify the phrase.
L. Moreover, the Court deems it appropriate to ascertain the ordinary meaning a lay person would give to the phrase. Kunin v. Benefit Trust Life Ins. Co., 696 F.Supp. 1342, 1345 (C.D.Calif.1988).
M. Having carefully considered the matter, the Court adopts the definition derived by the court in Kunin, supra. In that case, the court decided that an insurer's inclusion of "autism" within the limitation clause covering "mental illness" was not a reasonable interpretation of the policy and plan. Id. at 1347. In coming to this conclusion, the court adopted a definition of "mental illness" as an illness that "refers to a behavioral disturbance with no demonstrable organic or physical basis.... [A] mental illness stems from reaction to environmental conditions as distinguished from organic causes." Id. at 1346, 1346-47. The evidence in Kunin established that autism is one of the "pervasive developmental disorders ... defined by its symptoms" and having an unknown etiology, with "medical research [showing] increasingly strong evidence of a demonstrable organic basis for the syndrome." Id. at 1343, 1344. Noting that
[i]f the general nature of the cause of an illness is known and the cause is organic, the illness should not be encompassed within the term "mental illness" merely because of a lack of precision in the understanding of its causation[.] ... [The court found that] mental illness is often thought of by lay persons as having nonphysical, psychological causes, in the Freudian sense, as opposed to an organic basis. Where dysfunctions of the brain derive from an identifiable organic basis, as in the case of brain cancer or Alzheimer's disease, the condition would not commonly be understood as mental illness. A related factor which can distinguish mental illnesses is their causation by environmental factors, such *298 as traumatic experiences or childhood relationships.
Id. at 1346, 1347.
N. This Court finds the Kunin court's reasoning persuasive and, based upon that reasoning, determines the severe disorder at issue here is not a "mental illness" within the meaning of the second policy issued by defendant. Here, the evidence credibly establishes that the severe disorder affecting Rob Brewer stemmed most probably from a chemical imbalance in his brain, rather than from environmental factors such as a traumatic experience or a parental relationship. While the disorder is described through its symptoms, that in and of itself does not render it a "mental illness" as defined by this Court. Additionally, Rob Brewer was successfully treated with a regimen focused mainly on prescription medications. The secondary use of counselling to assist with Rob Brewer's adaptation to and recovery from the disorder does not take the malady within the realm of "mental illness." As Dr. Harris noted, counselling is used regularly to assist patients with diabetes and other chronic diseases.
O. Accordingly, the Court finds it was improper for defendant to deny coverage of the expenses incurred during Rob Brewer's third hospitalization. Thus, the Court will award judgment in favor of plaintiffs and against defendant in the total amount of $24,672.49 for improperly denied benefits, plus post-judgment interest at the statutory rate.
P. The parties' requests for attorneys' fees and costs will be taken up by separate order.
Q. Defendant no longer being the health insurance carrier for the plan provided by Robert Brewer's employer, and finding no evidence to support the additional relief requested, the Court will deny plaintiffs' other requests for relief.

ORDER
A memorandum dated this day is hereby incorporated into and made a part of this order.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiffs Robert P. Brewer and Robert C. Brewer recover from defendant Lincoln National Life Insurance Company a total of $24,672.49 in principal and postjudgment interest at the statutory rate, plus attorney's fees and costs to be decided during the course of subsequent proceedings.

ORDER
This matter is before the Court on plaintiff's motion to alter or amend this Court's judgment by granting prejudgment interest. Defendant concurs that plaintiff is entitled to prejudgment interest and states "the judgment should be amended as proposed by plaintiff."
Upon consideration,
IT IS HEREBY ORDERED that plaintiff's motion is granted and the judgment dated October 6, 1989, is altered only so as to change the total amount to $28,691.70 (principal and prejudgment interest) as suggested by plaintiff. In all other respects, the judgment remains in full force and effect.
Plaintiff's request for attorney's fees and expenses remains before the Court.
NOTES
[1] Pursuant to 29 U.S.C. § 1132(a)(3), plaintiffs seek declarations

that affective mood disorder is a physical ailment for which defendant is obligated to pay benefits in accordance with its policy[;] ... that the refusal of defendant to pay medical expenses incurred by plaintiff[s] for treatment of affective mood disorder was a breach of fiduciary duty, unlawful and vexatious[;] ... [and] that by the terms of the policy of insurance and pursuant to 29 U.S.C. § 1132, plaintiff[s are] entitled to coverage under said policy in the amount of $1,000,000 for any medical expenses arising in connection with any treatment rendered to plaintiff [Robert C. Brewer] for affective mood disorder.
Plaintiffs also seek an order permanently enjoining defendant "from denying plaintiff[s'] claim for benefits arising in connection with any treatment rendered to plaintiff [Robert C. Brewer] for affective mood disorder."