921 F.2d 150
 59 USLW 2400
 Robert P. BREWER, Natural Guardian and Duly Appointed Next
Friend of Robert C. Brewer, Appellee,
v.
LINCOLN NATIONAL LIFE INSURANCE COMPANY, Appellant.
Robert P. BREWER, Natural Guardian and Duly Appointed Next
Friend of Robert C. Brewer, Appellant,
v.
LINCOLN NATIONAL LIFE INSURANCE COMPANY, Appellee.
 Nos. 90-1226EM, 90-1227EM.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 8, 1990.
ecided Dec. 7, 1990.
 
 Clark Cole, St. Louis, Mo., for appellant.
 Joseph F. Devereux, St. Louis, Mo., for appellee.
 Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Robert P. Brewer appeals the district court's determination that the care administered his son, Robert C. Brewer, was "psychiatric care" and its refusal to award attorney fees in his favor. Lincoln National Life Insurance Company (hereinafter "Lincoln National") also appeals, challenging both the district court's determination that Robert C. Brewer was not hospitalized due to a "mental illness" and its refusal to admit into evidence material contained in Lincoln National's "Post-Trial Appendix." We reverse the district court's conclusion that the son's affliction was not a "mental illness" and, consequently, obviate the need to address the other issues presented in this appeal.
 
 I. BACKGROUND
 
 2
 Robert P. Brewer participated in an employee welfare benefit plan provided by his employer, Missouri Encom, Inc. Health benefits under the plan were provided by Lincoln National.
 
 
 3
 Robert P. Brewer's son, Robert C. Brewer, was hospitalized on three occasions between October 1986 and October 1987. The hospitalization was prompted by a sharp decline in the son's grades, repeated incidents of lying, and other behavioral problems both in and out of school. T.Tr. 16-18. Brewer's son was diagnosed as suffering from affective mood disorder, and he was successfully treated with a combination of drugs and psychotherapy.
 
 
 4
 One insurance policy was in effect during the first two visits, and a second policy was in effect during the last visit. The first policy limited its coverage for hospital charges associated with "mental illness(es), functional nervous disorder(s) ... or for psychiatric or psychoanalytic care" to a maximum of $50,000. The second policy had the same limit for charges associated with care of "mental illness(es)." Neither policy defined the phrase "mental illness." The first policy defined "illness" as "a bodily disorder or disease, pregnancy, mental infirmity or bodily injury," and the second policy contained a similar definition.
 
 
 5
 Claims were submitted to Lincoln National, which paid for the care in accordance with the policies' provisions regarding mental illnesses. A total of $55,912.87 was unpaid by Lincoln National; $31,240.38 due to the cap in the first policy and $24,672.49 due to the cap in the second policy. It is undisputed that these charges would have been paid if the limitations on coverage did not apply.
 
 
 6
 At trial, the district court heard testimony from three doctors of varying specialties. The testimony indicated that the precise cause of the son's condition was unknown, but that mounting medical evidence suggested that affective mood disorder is genetically or biologically caused. T.Tr. at 47, 88-89. Based on the testimony, the district court concluded that the son did not suffer from a mental illness because a " 'mental illness stems from reaction to environmental conditions as distinguished from organic causes' " and that " 'mental illness is often thought by lay persons as having nonphysical, psychological causes, in the Freudian sense, as opposed to an organic basis.' " Brewer v. Lincoln Nat'l Life Ins. Co., 730 F.Supp. 292, 297 (E.D.Mo.1989) (quoting Kunin v. Benefit Trust Life Ins. Co., 696 F.Supp 1342, 1346, 1347 (C.D.Cal.1988), aff'd, 910 F.2d 534 (9th Cir.1990)). The district court also determined that the treatment was psychiatric care because it was " 'the sort of treatment, such as electroshock therapy and psychotropic medication, rendered to a patient who has been admitted to a psychiatric ward in order to attend to his or her psychiatric disorder.' " Id. (quoting Simons v. Blue Cross & Blue Shield of Greater New York, 144 A.D.2d 28, 33, 536 N.Y.S.2d 431, 434 (1989)). Consequently, the court ruled that Lincoln National properly denied coverage under the first policy because coverage was limited as to "psychiatric care" but that coverage was improperly denied under the second policy because there was no cap on psychiatric care and the son did not suffer from a mental illness.
 
 II. DISCUSSION
 
 7
 Initially, we must determine whether the district court properly utilized Missouri's rule of construction requiring that ambiguities in insurance contracts be resolved in favor of the insured (the "contra insurer rule").[1] While it is true that state law can be used as a guide for fashioning the federal common law applicable to ERISA, Lyman Lumber Co. v. Hill, 877 F.2d 692, 693 (8th Cir.1989), state law cannot be used if it is contrary to the provisions of ERISA. Rockney v. Blohorn, 877 F.2d 637, 643-44 (8th Cir.1989). We conclude that this state law rule of construction violates the provisions of ERISA and thus cannot be used to interpret the plan's terms.
 
 
 8
 ERISA is a broad, comprehensive regulation that preempts state laws relating to employee benefit plans, 29 U.S.C. Sec. 1144(a), unless the state law in question "regulates insurance, banking, or securities." Id. Sec. 1144(b)(2)(A). The preemption clause applies broadly to all state laws that have any direct or indirect relation to pension plans even if they were not designed specifically for that purpose. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-98, 103 S.Ct. 2890, 2899-2901, 77 L.Ed.2d 490 (1983); Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981). However, a state law is not preempted if it regulates insurance; that is, if it " 'has the effect of transferring or spreading a policyholder's risk, ... is an integral part of the policy relationship between the insurer and the insured, and ... the practice is limited to entities within the insurance industry.' " Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 48-49, 107 S.Ct. 1549, 1553-54, 95 L.Ed.2d 39 (1987) (quoting Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)).
 
 
 9
 Missouri's rule of construction clearly affects pension plans. However, it does not regulate the insurance industry. We agree with the Sixth Circuit that the contra insurer rule is a "general principle of contract construction [that] does not effect a spreading or transferring of policyholders' insurance risk, but rather forces the insurer to bear the legal risks associated with ambiguous policy language." McMahan v. New England Mut. Life Ins. Co., 888 F.2d 426, 429 (6th Cir.1989). Furthermore, this rule of construction is nothing more than a specific application of general state contract principles and was not specifically designed for the insurance industry. E.g., Shelter Mut. Ins. Co. v. Haller, 793 S.W.2d 391, 393 (Mo.Ct.App.1990); Farm Bureau Mut. Ins. Co. v. Broadie, 558 S.W.2d 751, 755 (Mo.Ct.App.1977); see also McMahan, 888 F.2d at 429 (discussing Kentucky law). Consequently, the contra insurer rule does not regulate insurance and is preempted by ERISA.
 
 
 10
 Our conclusion is further supported by the Supreme Court's decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There, the Supreme Court injected principles of trust law into ERISA and decided that a denial of benefits was to be reviewed de novo unless the plan specifically granted the plan administrator discretion to determine eligibility. Id. at 114, 109 S.Ct. at 956. We have previously interpreted Bruch to mean that "unless the plan language specifies otherwise, courts should construe any disputed language 'without deferring to either party's interpretation.' " Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir.1989) (quoting Bruch, 489 U.S. at 112, 109 S.Ct. at 955) (emphasis added).[2]
 
 
 11
 Having determined that neither party's construction should be favored, we still must decide how the phrase "mental illness" is defined. ERISA does not provide an express answer, so we must "ascertain the proper federal common law principles that should govern." Lyman Lumber, 877 F.2d at 693. And, while "fashioning a body of federal common law, we may look to state law for guidance." Id., as noted above, state law is an inappropriate guide in this situation. Consequently, we look elsewhere, first at ERISA itself.
 
 
 12
 Lincoln National was required to furnish plan descriptions "written in a manner calculated to be understood by the average plan participant...." 29 U.S.C. Sec. 1022(a)(1). It would be improper and unfair to allow experts to define terms that were specifically written for and targeted toward laypersons. This requirement provides a source from which we may fashion a federal common law rule; the terms should be accorded their ordinary, and not specialized, meanings.
 
 
 13
 The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.
 
 
 14
 Neither policy in this case limited the definition of "mental illness" to only those illnesses that have a non-organic origin, and the district court should not have adopted a definition that effectively imposed such a limitation. By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term "mental illness" as a layperson would have, which is the examination we conclude ERISA and federal common law require.
 
 III. CONCLUSION
 
 15
 Robert C. Brewer's disease manifested itself in terms of mood swings and aberrant behavior. Regardless of the cause of his disorder, it is abundantly clear that he suffered from what laypersons would consider to be a "mental illness." Consequently, Lincoln National properly limited its coverage under both policies.[3] For these reasons, the district court's order is affirmed as to the first policy and reversed as to the second.
 
 
 
 [1]
 While the district court did state that it would "review the terms of the plans without giving deference to either side's position," Brewer, 730 F.Supp. at 296, the court also determined that state law could be used as a guide in interpreting the policies. To that end, the court referred to Missouri cases holding that "[p]rovisions restricting coverage are construed in favor of the insured and against the insurer," id. (citing Citizens Ins. Co. of N.J. v. Kansas City Commercial Cartage, Inc., 611 S.W.2d 302, 307 (Mo.Ct.App.1980) (per curiam)), and that ambiguities should be "resolved in favor of the insured." Id. at 296-97 (citing Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo.1982) (en banc)). We cannot tell whether or to what extent the contra insurer rule affected the district court's opinion, and are compelled to address the issue because of this uncertainty
 
 
 [2]
 The Ninth Circuit recently addressed both this argument and the preemption argument and reached results contrary to those we reach today. See Kunin, 910 F.2d at 538-41. We expressly disagree with our sister court's conclusions and decline to follow Kunin
 
 
 [3]
 Because both policies limited coverage for mental illnesses, we do not need to decide whether the district court properly characterized the treatment as "psychiatric care." There is also no need to review either the exclusion of Lincoln National's "Post-Trial Appendix" or the denial of Brewer's attorney fees