Sandra Kay GARRED; Barry G. Garred,
Husband and Wife, Plaintiffs,

v.

GENERAL AMERICAN LIFE
INSURANCE COMPANY,
et al., Defendants.

Civ. No. 89–5108.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Sept. 20, 1991.

James M. Roy, Roy & Lambert, Charles L. Harwell, Cypert, Crouch, Clark & Harwell, Springdale, Ark., for plaintiffs.

Sidney P. Davis, Davis, Cox & Wright, Fayetteville, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* This case originated in the Circuit Court of Washington County, Arkansas. The action was removed to this court on September 9, 1989. Plaintiffs' motion to remand was denied by opinion dated November 1, 1989. *See Garred v. General American Life Ins. Co.,* 723 F.Supp. 1325 (W.D.Ark.1989). On November 11, 1989, a stay was entered to allow the plaintiffs to exhaust their administrative remedies. The action was reopened on May 1, 1991, and plaintiffs were granted leave to file an amended complaint.

In their complaint plaintiffs, Barry G. and Sandra Kay Garred, seek payment of medical bills under a group insurance policy covering the employees of Continental Ozark, Inc. Barry Garred was a full-time employee of Continental Ozark, Inc. Sandra Garred as a spouse of an employee was covered by the group insurance policy.

The defendants are the General American Life Insurance Company, T.L.A. Group Insurance Trust, Plan B, and the Lewer Agency, Inc. The General American Life Insurance Company, is the insurance company that issued policy number MCP–2900–S to the trustees of the TLA Group Insurance Trust Fund. The TLA Group Insurance Trust Fund Plan B, is a trust created by the Lewer Agency that Continental Ozark, Inc. joined in order to fulfill its obligations under its employee welfare benefit plan. The Lewer Agency administers claims under the policy of insurance issued by General American Life Insurance Company.

The court has before it the administrative record which the parties have stipulated constitutes the entire record before the plan administrator at the time an ERISA review of plaintiffs' claim was conducted. Additionally, the court has before it the briefs of the parties. Plaintiffs have filed a motion to strike certain portions of the supplemental record provided by the defendants. Certain of the objections have been mooted by the provision of a certified

copy of the master insurance policy. The plaintiffs' remaining objections deal with the handwritten responses of Dr. Robert J. Corday to defendants' inquiries regarding Ms. Garred's condition. The objections by and large go to the weight to be given these materials and not to the inclusion of these materials in the record. ERISA contemplates a review of all materials taken into consideration by the claims administrator in reaching its decision. Thus, the materials will be considered. The issue is now before the court for a *de novo* review conducted pursuant to *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also Lakey v. Remington Arms Co.*, 874 F.2d 541, 543 (8th Cir.1989).

*Background*

Ms. Garred at all times relevant to this litigation was a participant and covered individual under the employee welfare benefit plan at issue herein. The parties agree that Ms. Garred was eligible for medical insurance benefits.

Between September 11, 1988, and July 18, 1990, Ms. Garred incurred approximately $39,524.71 in medical expenses due to hospitalizations and related medical treatments stemming from depression and reactive psychosis. Ms. Garred made a claim for payment through the defendants. Defendants denied the claims initially and on review on the basis of three exclusions in the policy.

In this regard, the policy provides:
Major Medical Expense Benefits are not payable for:

\* \* \* \* \* \*

9) intentionally self-inflicted injury;

\* \* \* \* \* \*

15) psychological testing, counseling and group therapy;

\* \* \* \* \* \*

22) treatment of nervous and mental condition;

Master Policy at 8E–8F. These exclusions are not further explained in the policy.

Resolution of the issues before the court requires a review and discussion of the facts relevant to Ms. Garred's illness and medical treatment. The record before the court largely consists of the medical records of the various treating and consulting physicians as well as affidavits, correspondence from, and the deposition testimony of the doctors.

Beginning in July of 1987, Ms. Garred began to evidence symptoms of major depression that resulted in the need for treatment and counseling. Dr. James H. Arkins, Ms. Garred's treating physician, noted on December 18, 1987, that plaintiff had been "undergoing severe endogenous depression since July." It was further noted that plaintiff was "having some suicidal ideation" and was undergoing counseling.

Dr. George Cole notes she was diagnosed with endometriosis "as well as severe PMS with associated depression." Letter from Dr. Cole to Dr. Arkins dated January 26, 1988. Ms. Garred underwent a hysterectomy early in 1988. On September 11, 1988, plaintiff was briefly admitted to Charter Vista Hospital. The primary diagnosis was listed as schizophreniform disorder. The history of present illness stated:

The patient's husband relates to staff that approximately 1½ weeks ago Sandra became withdrawn, showing preoccupied behavior and increasingly poor sleep pattern. The night prior to admission she became uncommunicative with the family, appeared to be agitated and was found in bed praying fervently. She did this all night along. She was speaking in broken sentences. She had not slept at all in the 24 hours prior to admission. Note is made that she had a poor eating pattern for the last week or two and has lost five pounds.

The husband did relate that there had been a similar episode of preoccupation and depression a few months prior to her hysterectomy in April, 1988. She was treated with Desyrel and apparently is continuing on this medication. He notes that she has had multiple 'life stresses' including a son with a kidney disease. He is now age 12 and he may need a transplant. There is a 10 year old daughter that had been born premature-

ly. The patient apparently has been quite deeply involved in her religion and recently a bible study leader has convinced her not to take her hormones or her antidepressants. There was a referral then to some internal conflict over this bible study.

Ms. Garred was discharged from Charter with arrangements made for her to seek alternate care.

On September 12, 1988, plaintiff was admitted to the Springdale Memorial Hospital Psychiatric Unit for "a brief reactive psychosis." Springdale Memorial Hospital Discharge Summary for discharge on 9/20/88. The personal history and physical examination taken at Springdale Hospital contains the following remarks regarding Mrs. Garred's history:

> According to the composite history, Mrs. Jarred has been under considerable stress for the (sic) eight-to-ten years. She had a premature child about nine or ten years ago. The infant was in Neonatal Care in Tulsa for a prolonged period of time. The child now is doing well. She was in for a recent strept (sic) throat. She has a son who has diabetes insipidus and there is a possibility of need for dialysis and/or a kidney transplant. This has developed over the past six months to a year which has been a stress for her. She is described as having a lot of abdominal pain and discomfort and premenstrual syndrome or monilial irregularities leading up to a hysterectomy in April or May of this year. Prior to that time, she is described by Dr. Arkins and her husband as being depressed and at times having suicidal ideation. She was treated with Desyrel which seemed to help. Also during this time period, she and her husband were foster parents for a premature child that was later adopted out by their minister. There seems to be some concern or transference with that child and her premature daughter. She apparently was doing fairly (sic) up until the last week or two when she developed an apparent acute psychotic break. This may have been precipitated by a man in Little Rock who is saying the coming Christ is due

today. She became more and more informed in this, one more religious ideation and some guilt over the weekend.

Springdale Memorial Hospital Personal History and Physical Examination, Dr. E.C. Jones, M.D., admission date 9/12/88.

The mental status examination reveals the following comments were made by Dr. Jones:

> MENTAL STATUS EXAMINATION shows a well-developed, well-nourished, attractive white female lying in bed, speaking in the room with motion, talking about being with God and being with Christ. There is some concern that she is suicidal and wanting to kill herself according to the husband. He feels she believes she is in heaven at this time. Dr. Arkins thought she was probably suicidal when he saw her Sunday at Charter Vista Hospital. Religious delusions are present. It is not clear whether any auditory or visual hallucinations are present.

The discharge diagnosis from this hospitalization was stated as a "brief reactive psychosis."

Ms. Garred underwent a psychological evaluation at the Ozark Guidance Center (OGC). The OGC personnel summarized their findings as follows:

> Mrs. Garred is a 32 year old Caucasian, married woman with two children. Both of her children are in poor health, especially her son who is facing a kidney transplant in the next few years. She had been under extraordinalry (sic) stress in the past year, which resulted in a psychotic episode with delusions and auditory hallucinations.

> Under ordinary circumstances, Mrs. Garred has adequate resources to deal with stress. In fact, she has been doing fairly well in the past ten years dealing with two frail children and managing a household. Under high levels of stress, however, she has difficulty realistically facing problems. She tends to escape into fantasy and to deny conflict, preferring to see herself in a moralistic and highly perfectionistic light. She has

trouble living up to these high standards and may become delusional when faced with unavoidable conflict.

Recommendations whould (sic) be for individual, supportive therapy which would attempt to teach Mrs. Garred to allow herself to make mistakes and be less than perfect. Emphasis on facing reality and decreasing fantasy escape would also be important. Mrs. Garred might benefit from participating in a women's therapy group which emphasized assertiveness, but this might be more appropriate after some time in individual treatment. Precautions should be taken to avoid overwhelming Mrs. Garred in treatment, as she could become delusional again.

Ozark Guidance Center, Psychological Evaluation pages 3–4.

On October 24, 1988, Dr. Arkins made the following notes in his progress report:

Addendum: have reviewed her lab from her Charter Vista hospitalization and she did have an elevated T4 at 14.3. She could therefore have hyperthyroidism as etiology and Wed. a.m. will get a Thyroid II panel to include a TSH level also get wt., BP and pulse by the nurse at that time. F/U on Monday as planned.

On November 4, 1988, Dr. Arkins noted:

Condition continues to worsen and I have explained to her that she needs to be under psychiatric care rather than my care. I have personally talked to Dr. Ed Jones in Springdale today and he will be seeing her this afternoon.

Finally on November 5, 1988, Dr. Arkins notes:

Adm. to S'Dale Hosp following self-inflicted overdose of Imipramine.

The records of Springdale Memorial Hospital reveal the following:

Miss Garred is a 35 year old white female admitted to Springdale Memorial Hospital on 11/05/88 following an overdose of Impromen, amount unknown. The patient became semi-comatose, unresponsive, with respiratory difficulty and was admitted to the Intensive Care Unit where she was intubated. At the time of my examination, she was breathing, what appears to be, medically stable, remains depressed, is able to give fairly good history.

Miss Garred has a history of low grade depression for the past 8–10 years. This has gone along with multiple conflicts with health and children, with a daughter who is premature and multiple problems related to that and a son who has renal difficulty. In the spring of this year, depression became more profound and she was treated by James Arkins, M.D. her family physician with Desyrel without results. She was later given Impromen with good response. She did well up until June 1988, when she was admitted to the Psychiatric Unit with acute psychotic episode, thought to be transient. It cleared quickly with Loxitane. She was discharged for follow-up by her family physician Dr. Arkins. She has been seen in counselling by Dr. Batson with a bad disassociation in Fayetteville. Loxitane has been tapered since that time. She apparently developed a fairly significant extra paraminal reaction to the Loxitane, necessitating it (sic) stoppage. Soon her depression has re-occurred and she was started on Impromen up to 150 mg. by Dr. Arkins. At his request, she was seen by me Friday, at which time she was markedly more depressed, suicidal ideation was vague, but present. In close questioning, observing, it seems like the depression that she is going through now is similar to what she had in the spring, but markedly different from the psychotic episode that she had in June 1988.

Springdale Memorial Hospital Report of Consultation, Dr. E.C. Jones, 11–5–88. Dr. Jones listed his diagnostic impression as "[m]ajor depression, recurrent."

Ms. Garred was discharged on November 21, 1988, with the discharge diagnosis listed as follows: 1) life threatening overdose of imipramine; 2) major depression, recurrent. The laboratory analysis noted the "[t]hyroid profile showed a slightly elevated T4 at 10.4, slightly underactive T3 at 17.8, normal FTI at 1.1." Springdale Me-

morial Hospital Discharge Summary 11/21/88.

Ms. Garred was admitted to Springdale Memorial Hospital again on November 30, 1988, "following an overdose of tricyclic antidepressants felt to be a combination of Ascendin, Laxitane and Tofranil, exact dose is not clear." Dr. Jones makes the following remarks regarding Ms. Garred:

> In review patient's history, throughout the Spring of 1988 there is a history from James Arkins, M.D., her family physician, of depression which did not respond to Desyrel but did respond to Tofranil. At that time she was undergoing multiple situation of problems. She has a son with diabetes insipidus who may be requiring a kidney transplant. She had been through a lot of stress with a daughter who was a premature birth who has multiple medical problems. There was felt to be considered hormonal abnormalities. She had a hysterectomy, something that she had resisted in the spring and did well following that. She was initially admitted to Springdale Memorial Psychiatric Unit in June of this (sic) with an acute psychotic episode. At which time she was delusional feeling that the rapture had occurred, that she had died and gone to heaven. She was started on Loxitane, quickly responded becoming nonpsychotic and was discharged over a brief hospitalization for Loxitane to be tapered and for her to see Dr. Bateson a counselor associated with the baptist association in Fayetteville. As the Loxitane was decreased she became more depressed, was started on Tofranil again by Dr. Arkins, overdosed requiring admission to Springdale Memorial Hospital ventilatory assistance during this overdose. She had several grand mal seizures. She was then transferred to the Psychiatric Unit, treated with individual, group, recreation and milieu therapies, initially a combination of Tofranil and Stelazine was used with limited effectiveness and then she was switched to Asendin up to 200 given her 50 mg. per day. She responded well. She was discharged, had recurring suicidal ideation and took another overdose. Situation surrounding the overdose is seen to be obsessive thoughts regarding suicide with lack of sleep. She is readmitted to Springdale Memorial Hospital at this point medically stabilized and is being transferred to a Dallas psychiatric facility for more intensive and long term therapy.

Springdale Memorial Hospital Discharge Summary 12/2/88.

Ms. Garred was admitted to Westpark Medical Center in McKinney, Texas, on December 3, 1988. Her final diagnosis upon discharge from that facility on December 27, 1988, was stated as follows: 1) major depression, recurrent, severe; 2) Hypothyroidism (which was a partial cause for her major depression). According to Dr. Paul Meier a low thyroid level is a contributing factor in cases of depression, January 6, 1988, letter from Dr. Meier to Mike Dlugolecki of the Lewer Agency. In his deposition Dr. Meier states "as a psychiatrist, I would guess that the hypothyroidism could have been one of the contributing factors to her depression and may have been as much as a ten percent factor in her depression. There were psychological factors also that she was worried about that definitely contributed to her depression." Deposition at 6. In further describing the relationship between biological problems and other areas in which Ms. Garred was undergoing stress, Dr. Meier states, "the physical condition could have made mild stresses into major stresses, or made mountains out of mole hills, in other words." Deposition at 8. Dr. Meier noted Dr. Wade would be in a better position to determine what percentage of her depression was caused by physical factors. Deposition at 6.

> Dr. Randall Wade's affidavit states:
>
> That I treated Sandy Garred during the time that she was suffering from depression in 1988–1989 and am familiar with her complete medical history.
>
> That at the time of my treatment of Mrs. Garred I found her to be suffering from thyroid problems, hormonal imbalance stemming from her post-hysterectomy condition and anemia.

It is my considered medical opinion that Mrs. Garred's depression was caused by these three physical conditions.

In an affidavit Dr. G. Doty Murphy, III, of the Immanuel Clinic in Springdale, Arkansas, states:

3. That I have treated Sandy Garred for a number of years and because of my treatment have become well acquainted with her medical history.

4. That Mrs. Garred has been treated for hormonal imbalance and thyroid problems since 1982.

5. That I treated Mrs. Garred for her depression in 1988 and 1989 and found her to have Thyroid Antibodies consistent with Thyroiditis. She had a significant imbalance in her thyroid hormones which was indicative of Hypothyroidism. She was also found to have abnormal requirements for potassium and magnesium.

6. That it is my considered medical opinion that the depression suffered by Mrs. Garred during this time was caused by and primarily affected by her thyroid condition and hormonal imbalance problems.

Dr. Bronson Stillwell in a letter of December 13, 1989, states as follows:

Mrs. Garred has had a relatively complicated illness which began as a psychotic illness and progressed into a depressive disorder which was relatively resistant to standard treatment. There was an associated thyroid disorder for which she began treatment several months after the onset of her psychotic and depressive disorder. Mrs. Garred's psychiatric illness clearly meets the criteria for the definition of mental disorder as in the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association. I have no doubt that her thyroid dysfunction played a role in her general psychiatric disorder, but I do not believe that it was the primary or main cause of her psychiatric illness.

Although I do not have hard evidence of a genetic or biochemical component in Mrs. Garred's psychiatric illness, many if not most individuals with a similar disorder do have a biological basis for this disorder. As such, I believe that it should be categorized as a medical disorder in contrast to those psychiatric disorders which are primarily a result of emotional reaction to various psychosocial traumas or stressors.

In conclusion, I believe that Mrs. Garred's psychiatric disorder was a mental disorder with a physical basis and as such could only be treated by physicians in contrast to non-physical mental disorders which can be treated by other mental health professionals.

Subsequently on June 27, 1990, Dr. Stilwell states:

I had earlier stated that there was no hard evidence of a genetic or biochemical component in Mrs. Garred's psychiatric illness, but that many if not most individuals with a similar disorder do have a biological basis for this disorder.

Since I rendered that opinion, Mrs. Garred had a respite from the illness for approximately nine months while she was treated with Imipramine, Lithium Carbonate, and thyroid. She stopped these medications in the Spring of 1990 and relapsed into her illness within a matter of few weeks. There were no apparent significant psychosocial stressors during this time.

In my opinion, this new information serves to confirm that there is a biochemical basis for Mrs. Garred's psychiatric illness. I continue to believe that Mrs. Garred's psychiatric disorder is a mental disorder with a physical basis.

Dr. Robert J. Corday a consultant for the defendants was asked on July 12, 1989, to review Ms. Garred's file and advise whether her hypothyroidism is the cause of her depression. Dr. Corday opined that the hypothyroidism would be a precipitant not a cause of major depression. He believed the hypothyroidism was a coincidental finding.

By letter dated July 25, 1989, plaintiff's counsel was advised that the defendants would continue to deny coverage. The letter states as follows: "The primary diagno-

sis and reason for Ms. Garred's confinement is 'major depression; recurrent, severe.' The policy simply does not cover treatment of a nervous and mental condition or psychological testing, counseling and group therapy."

On February 4, 1991, Dr. Corday was again asked to review Ms. Garred's file to determine if her condition was mental or physical. Dr. Corday checked a box indicating the condition was mental. He commented as follows:

Major Depression, (1) psychotic break (2) religious experience Treated mostly with anti-depress. and antipsychotic meds. Maybe hypo-thyroid with depression but mental illness can have part of physical disease—That? easily treated. But depression 8–10 yrs. I.C.U. "physical," but due to drug overdose secondary to depression. Epileptic seizures connected with overdose—a symptom of O.D. Robert J. Corday, M.D. 2/7/91.

The court cannot determine what the contents of the file before Dr. Corday for review were.

It is the plaintiff's position that the chemical imbalance in her body was the precipitating cause of the problems. In opposition the defendants assert that the three exclusions quoted *supra* apply and that no benefits are due under the policy. Defendants primarily rely on the exclusion from coverage of nervous and mental conditions.

*Discussion*

■ The question before the court is whether Ms. Garred is entitled to medical benefits under the terms of the plan. In applying the *de novo* standard, the "straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989). "In conducting a *de novo* review, the court is bound by the provisions of the documents establishing an employee benefit plan 'without deferring to either party's interpretation.' " *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989), *quoting Firestone*, 109 S.Ct. at 956. *See also Wallace v. Firestone Tire*

*& Rubber Co.*, 882 F.2d 1327 (8th Cir.1989). "Notwithstanding the ennobling purposes which prompted passage of ERISA, courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." *Burnham*, 873 F.2d at 489.

■ Nor can the court construe ambiguities in favor of the insured and against the insurer. In *Brewer v. Lincoln National Life Ins. Co.*, 921 F.2d 150 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991), the Eighth Circuit specifically rejected the application of this principle of construction in ERISA cases. In so doing it noted:

While it is true that state law can be used as a guide for fashioning the federal common law applicable to ERISA, *Lyman Lumber Co. v. Hill*, 877 F.2d 692, 693 (8th Cir.1989), state law cannot be used if it is contrary to the provisions of ERISA. *Rockney v. Blohorn*, 877 F.2d 637, 643–44 (8th Cir.1989). We conclude that this state law rule of construction violates the provisions of ERISA and thus cannot be used to interpret the plan's terms.

*Id.* at 153. The court further noted that "the contra insurer rule does not regulate insurance and is preempted by ERISA." *Id.* Thus, we must reject plaintiff's request that we resolve ambiguities in the contract against the insurer.

Section 1022(a)(1) requires an employee benefit plan to furnish a plan description that is "written in a manner calculated to be understood by the average plan participant...." 29 U.S.C. § 1022(a)(1). In light of this requirement, the *Brewer* court held that "[i]t would be improper and unfair to allow experts to define terms that were specifically written for and targeted toward laypersons. This requirement provides a source from which we may fashion a federal common law rule; the terms should be accorded their ordinary, and not specialized, meanings." *Brewer*, 921 F.2d at 154.

With these principles in mind we turn to a review of the relevant exclusions. We

will address these issues in the order addressed by the parties.

The policy excludes coverage for "intentionally self-inflicted injury." By notices dated January 5, 1989, and January 25, 1989, the Lewer Agency denied payment of bills from Springdale Memorial Hospital, the NWA Cardiology Clinic, and an ambulance service because the charges were related to self-inflicted injuries. Plaintiff argues that there is no proof that the drug overdose was an "intentionally self-inflicted injury" as that term is understood. Further, plaintiff argues that it cannot be said from the record that "Sandy intended injury to herself so as to make applicable this exclusion." The court is referred to Dr. Jones' comment made on 11/5/88 that her exact intent was not clear.

The record is clear that Ms. Garred twice took overdoses of prescribed medications. The record is replete with references to suicidal thoughts. There is no indication in the record that the drug overdoses were "accidental". The court believes that laypersons would regard an intentional overdose as a suicide attempt or an intentionally self-inflicted injury.

The policy also excludes coverage for psychological testing, counseling and group therapy. Plaintiffs do not attempt to argue that this exclusion is inapplicable. Rather plaintiffs merely state no effort has been made to identify the charges that are being excluded under this policy provision. On this basis plaintiffs argue the blanket denial does not comply with the requirements of ERISA.

■ Whether the denial notice complies with the requirements of ERISA is a separate issue that will be addressed *infra*. The exclusionary language is not ambiguous. The policy does not cover psychological testing, counseling and group therapy. This is so regardless of whether this type of treatment was necessitated by a "physical" or "mental" condition.

Defendants state their primary and underlying basis for rejection of the claims is the policy provision that excludes payment for treatment of nervous and mental conditions. The policy does not define the phrase "nervous and mental condition." As plaintiffs note the policy does not contain any language suggesting whether the cause or the manifestation determines if the illness is covered. It is plaintiffs' position that the hospitalization and treatment rendered were for a physical illness rather than a mental condition.

Plaintiffs urge the adoption of the rule set forth in *Arkansas Blue Cross and Blue Shield, Inc. v. Doe*, 22 Ark.App. 89, 733 S.W.2d 429 (1987). In the *Doe* case the issue for determination was whether bipolar affective disorder is a physical illness or a mental or psychiatric condition. The testimony before the court was that although "bipolar affective disorder was classified as a mental condition, all but one agreed that only its symptoms fell within that classification and its cause was physical." *Id.* at 93, 733 S.W.2d 429. It was also noted that the "classification of illnesses by symptom rather than cause was falling into disfavor within the mental health profession, and a large number of physicians and people in psychiatry were now classifying illnesses by their cause or origin." *Id.* at 94, 733 S.W.2d 429. The Arkansas Psychiatric Society had also declared bipolar affective disorder to be an illness having a biological origin. The trial court's determination that bipolar affective disorder was a physical illness was affirmed.

■ Plaintiffs argue that the Arkansas rule concerning physical causation is part of the law of the State of Arkansas and as such it regulates insurance in the State of Arkansas. A state law regulates insurance if it " 'has the effect of transferring or spreading a policyholder's risk, ... is an integral part of the policy relationship between the insurer and the insured, and ... the practice is limited to entities within the insurance industry' ". *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48–49, 107 S.Ct. 1549, 1553–1554, 95 L.Ed.2d 39 (1987) (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982)). Although the rule set forth in the *Doe* case clearly affects insurance plans, it does not *regulate* insurance and is preempted by ERISA.

However, this does not prevent the court from using the *Doe* rule to "fashion" a body of federal common law if the state law decision is not an inappropriate guideline in view of the provisions of and purposes of ERISA.

We acknowledge that courts in other contexts have found mental disorders can have organic causes to which exclusionary language similar to that at issue here should not apply. *See, e.g., Kunin v. Benefit Trust Life Ins. Co.*, 898 F.2d 1421, 1424–25 (9th Cir.1990). Plaintiffs urge adoption of the rule set forth in *Doe* and *Kunin.* However, that option is not available to this court. The Court of Appeals for the Eighth Circuit has specifically declined to follow the reasoning in *Kunin.* In *Brewer v. Lincoln Nat. Life Ins. Co.*, 921 F.2d 150 (8th Cir.1990), the court stated it would be improper for the court to allow experts to define terms targeted toward laypersons. The court stated:

> The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.
>
> Neither policy in this case limited the definition of "mental illness" to only those illnesses that have a non-organic origin, and the district court should not have adopted a definition that effectively imposed such a limitation. By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term "mental illness" as a layperson would have, which is the examination we conclude ERISA and federal common law require.

*Id.* at 154.

Although the term used in the policy before the court is "mental condition" and not "mental illness," we do not believe this minor semantic difference allows this court to ignore the teachings of *Brewer.* The result is certainly harsh. However, the court believes to adopt the position plaintiff urges would fly directly in the face of the *Brewer* decision and would adopt a limitation that does not appear in the policy. Therefore, we conclude plaintiffs are not entitled to benefits under the terms of the policy.

■ Finally, plaintiffs argue that the defendants have violated several of the ERISA provisions dealing with the provision of a reasonable claims procedure. The fact that we have determined the administrator's denial of benefits under the policy is correct does not resolve the question whether defendants' actions were procedurally deficient under the terms of ERISA. While procedural defects do not necessarily entitle the plaintiffs to substantive benefits, the procedural requirements are not to be lightly disregarded. "[I]t is these procedural requirements that alter the very balance of knowledge and rights between covered employees and their employer." *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.1984). The substantive and procedural aspects in some instances may be difficult if not impossible to separate. *Id. See also Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1096 (9th Cir.1985). ("A substantive remedy would be appropriate only if the procedural defects caused a substantive violation or themselves worked a substantive harm.") We conclude that a remand in this instance would be a useless formality. Nevertheless, plaintiffs may be entitled to penalties for violations of the procedural requirements.

Plaintiffs argue that the computer generated denial letters fail to comply with the requirements set forth in 29 U.S.C. § 1133 and the corresponding regulations in 29 C.F.R. § 2560.503–1(f). Plaintiffs argue the letters are deficient in the following respects: 1) no specific reasons for the denials were provided; 2) no reference to the applicable section of the contract is

cited; 3) no notice of appeal rights or procedure was included; and when the claims were resubmitted no specific reasons for denial were given.

Under § 1133 every benefit plan shall "provide adequate notice in writing to any participant ... whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant...." 29 U.S.C. § 1133(1). Regulations promulgated thereunder further state the content of the notice shall provide the claimant the following information:

> (f) *Content of notice.* A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f).

Section 1133 further requires every benefit plan to afford participants whose claim has been denied "a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503–1(g). A limited period may be established during which time a "claimant *must* file any request for review of a denied claim." 29 C.F.R. § 2560.503–1(g)(3). Once a request for review has been made, the plan fiduciary is given a strict time frame within which it must conduct a review. 29 C.F.R. § 2560.503–1(h).

■ In this case, the plaintiffs received form benefit denial letters that contained the following sentence: "Please be advised that the charges submitted for psych. are in connection with services which are not covered by the master contract." In others the terms major depressive psychiatric treatment, self-inflicted injuries, mental/nervous conditions, depressive disorder, anxiety/depression, react. psychosis, or patient care are substituted for the term "psych."

No other explanation was given. No plan provisions are cited. No information regarding a review procedure is given. We conclude the notice given was woefully inadequate. *See White v. Jacobs Engineering Group Long Term Disability Benefit Plan,* 896 F.2d 344, 349 (9th Cir.1989); *Grossmuller v. International Union, United Auto., Local 813,* 715 F.2d 853, 858 (3d Cir.1983); *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 392 (7th Cir.1983); *Richardson v. Central States, Southeast & Southwest Areas Pension Fund,* 645 F.2d 660, 665 (8th Cir.1981).

■ Plaintiffs also state that the defendants failed to respond to their November 28, 1989, request for copies of the latest available summary plan description and plan description. Section 1024(b)(4) specifically provides "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description,...." 29 U.S.C. § 1024(b)(4). Section 1132(c) provides:

> "[a]ny administrator ... (B) who fails or refuses to comply with a request for information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in

its discretion order such other relief as it deems proper."

29 U.S.C. § 1132(c)(1)(B).

In exercising the discretion granted under this section, a court "may undoubtedly consider whether a denial of information prejudiced a plaintiff, but prejudice is not a prerequisite to an award of civil penalties." *Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842 (11th Cir.1990); *Lesman v. Ransburg Corp.*, 719 F.Supp. 619, 622 (W.D.Mich.1989), *aff'd without opinion*, 911 F.2d 732 (6th Cir.1990) (prejudice not a prerequisite but court may consider detrimental reliance or prejudice before imposing penalties). "There is nothing in § 1132(c) which establishes monetary loss as a prerequisite to the 'up to $100 a day,' which is in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the pensioner for actual loss." *Sandlin v. Iron Workers Dist. Council*, 716 F.Supp. 571, 574 (N.D.Ala.1988), *aff'd without opinion*, 884 F.2d 585 (11th Cir. 1989). *Cf. Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 153 (3d Cir.1987) (can be denied if claim for benefits not colorable and administrator displayed no bad faith in responding to the claim). The statute is designed to assure plan participants and beneficiaries access to pertinent information upon request. In light of this purpose, aggravation, frustration, and the need to hire an attorney have been recognized as prejudice for the purposes of § 1132(c) claims.

Defendants admit they did not furnish a copy of the summary plan description upon request. July 29, 1991, answer, ¶ 19. No explanation is offered in the answer or in the brief to the court for this omission. We cannot determine whether the failure to respond was through neglect or misfeasance.

We cannot condone such a failure on the part of the administrator. Here the administrator not only failed to supply the requested information but also failed to comply with ERISA's procedural requirements regarding claim denials and the provision of a "full and fair" review. *But see Groves v. Modified Retirement Plan for Hourly Paid Employees of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109 (3d Cir.1986) (penalties against the administrator not available for violations of § 1133 and 29 C.F.R. § 2560.503–1(f)). These failures resulted in a lengthy court action. It was not until plaintiffs had hired an attorney and filed suit that the administrator even attempted to fully articulate its reasons for denial. Even then, the administrator ignored a request for information, or willfully refused to provide information it is obligated to provide under ERISA's terms.

The court cannot allow these deficiencies to go unredressed. Therefore, we believe a penalty should be assessed in the amount of $50.00 per day from December 28, 1989, to present. Thus, penalties in the total amount of $15,775.00 will be assessed.

■ Plaintiff's request an award of attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). Section 1132(g)(1) provides that "[i]n any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The courts have almost uniformly adopted the following five factors that should be considered in determining whether to award fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parts' position. *Nachwalter v. Christie*, 805 F.2d 956, 961–62 (11th Cir.1986); *Lawrence v. Westerhaus*, 749 F.2d 494, 495 (8th Cir.1984). Additionally, a claim may be denied solely because plaintiff obtained no relief under the statute. *Lawrence*, 749 F.2d at 496. In light of the court's assessment of penal-

ties, we decline to award attorney's fees to the plaintiffs.

 Finally, plaintiffs renew their request for a jury trial. In a recent appeal arising out of this court, the Court of Appeals for the Eighth Circuit again concluded that the claimants "seventh amendment argument is without merit." *Kirk v. Provident Life and Accident Insurance Co.*, 942 F.2d 504 (8th Cir.1991). *See also In re Vorpahl*, 695 F.2d 318, 322 (8th Cir.1982).

A separate judgment in accordance herewith will be concurrently entered.

### JUDGMENT

On this 19th day of September, 1991, the court finds for the reasons set forth in a memorandum opinion of even date that the decision of the administrator denying benefits to the plaintiffs should be upheld. However, the court finds that the plaintiffs are entitled to an award of penalties in the total amount of $15,775.00 against the defendants. Said award shall bear interest at the rate of 5.68% pursuant to 28 U.S.C. § 1961 from this date until paid.

IT IS SO ORDERED.