Lisa **HOLFORD**, Plaintiff,

v.

**EXHIBIT DESIGN CONSULTANTS,**
Defendant.

No.  5:02–CV–66.

United States District Court,
W.D. Michigan,
Southern Division.

Sept. 9, 2002.

Martha W. Atwater, Grand Rapids, MI, for Plaintiff.

Michael J. Bommarito, Lansing, MI, for Defendant.

## *OPINION*

ENSLEN, District Judge.

This matter is before the Court to consider Plaintiff Lisa Holford's Application for Default Judgment and Corrected Application for Default Judgment. Defendant Exhibit Design Consultants has opposed the relief. Both parties have had multiple opportunities to file briefs and supporting documents. Hearing of the matter is unnecessary in light of the briefing and the issues presented.

### *BACKGROUND*

Default was entered against Defendant by the Clerk for failing to timely answer and defend. Thereafter, by agreement of the parties, the default was set aside except as to Count II of the Complaint. Count II alleges that Defendant violated the Consolidated Omnibus Reconciliation Act, 29 U.S.C. §§ 1161–1169, ("COBRA"). COBRA is an amendment to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). More particularly, Plaintiff alleges that Defendant violated section 1166 by failing to provide Plaintiff with written notice of her right to continue health coverage upon

termination of her employment.[1] *See also* 29 U.S.C. § 1132(c) (enforcement provision).

Regarding such claim, Defendant admits that it did not properly notify Plaintiff of her COBRA rights on termination. Nevertheless, it requests that the Court view its non-compliance indulgently because it provided an insufficient COBRA notice in its Employee Handbook (such that it did not act in "bad faith" as to the statutory violation), because of its new-found knowledge and respect for COBRA,[2] and because it is a small employer who has suffered from recent economic downturns. Defendant also asserts that it has attempted to right the situation by offering to Plaintiff COBRA coverage retroactive to the effective date of her separation. Plaintiff has argued that this offer may well not return her to the *status quo ante* because the offer asserted allows the health insurer to deny coverage as to the retroactive medical expenses and because Defendant's offer would require lump sum payment as opposed to payment over time. Defendant in its Sur Reply Brief, however, argues that Plaintiff has misunderstood the terms of its offer; that is, the offer was not intended to assert any limitations on insurability nor any coverage limitations (other than those that would ordinarily apply to covered employees) and was not intended to demand lump sum payment. Plaintiff seeks actual damages of $16,984.27, consisting of unpaid medical expenses less unpaid premiums. Plaintiff also seeks a statutory penalty of $110 per day between April 9, 2001[3] and August 23, 2002; in other words, $110 for 502 days for a total of $55,220.00. Finally, Plaintiff seeks attorney fees and costs in the amount of $32,406.25.

## LEGAL ANALYSIS

Two quotations from the well-tilled ground of COBRA litigation provide an overview of COBRA's notice requirements:

> The notification requirements of COBRA are clear. In the event of a covered employee's termination, an employer must notify the administrator of the group health care plan within thirty days, *id.* § 1166(a)(2); the administrator then has fourteen days to notify the qualified beneficiary of her right to continue coverage, and this period may be longer if the plan is a multiemployer group health care plan and it so provides. *Id.* § 1166(a)(4). An employer or plan administrator who sends proper notice to the covered employee's last known address is deemed to be in good faith compliance with COBRA's notification requirements. *Truesdale v. Pacific Holding Co./ Hay Adams Div.*, 778

1. Under the language of section 1166, an employer must notify a plan administrator and the plan administrator must notify the employee of the qualifying event and right to COBRA coverage. The Court must assume, therefore, that Defendant occupied a role as plan administrator since this issue has not been raised or disputed. *See Torres–Negron v. Ramallo Bros. Printing, Inc.*, 203 F.Supp.2d 120, 124 (D.Puerto Rico 2002) (making a like assumption).

2. This determination, though laudable, is not the true test for determining sanctions aimed at deterrence. As in this Court's criminal cases, many defendants express respect and allegiance to the laws of the land while their deeds are being weighed in the balances of justice. The legitimate goal of deterrence (which is the object of the civil fine provision applicable in this case) is to see that litigants will observe the same respect for the laws when the courts are afar off and their conduct is hidden.

3. Given the date of the termination, April 9, 2001 is the last day which Defendant could have delivered a COBRA notice to Plaintiff under the statute's 44 day notice period. Thus, the statutory penalty may not be assessed before that date.

F.Supp. 77, 81–82 (D.D.C.1991); *see also Conery v. Bath Associates,* 803 F.Supp. 1388, 1398 (N.D.Ind.1992) ("Courts that have considered [how notice of eligibility must be communicated] have determined that a good faith attempt to comply with a reasonable interpretation of the provision is sufficient.").

A qualified COBRA beneficiary may elect continuation coverage within sixty days of the qualifying event or of notice of the qualifying event, whichever is later. *Local 217 [v.MHM, Inc.],* 976 F.2d [805] at 809 [(2d Cir.1992)] (citing 29 U.S.C. § 1162(3)); *Communications Workers of America v. NYNEX Corp.,* 898 F.2d 887, 888–889 (2d Cir.1990) (discussing COBRA); *see also Gaskell v. Harvard Coop. Soc.,* 762 F.Supp. 1539, 1541 (D.Mass.1991) ("Unless and until such notice is given to the employee, the continuation period cannot begin to run."). Continued coverage extends for a maximum period of eighteen months. 29 U.S.C. § 1162(2)(A) . . . .

*Hubicki v. Amtrak Nat. Passenger R. Co.,* 808 F.Supp. 192, 196 (E.D.N.Y.1992).

"Unfortunately, COBRA contains no specific requirements as to the manner in which notice must be given. . . . [The] courts that have addressed the issue have held that 'a good faith attempt to comply with a reasonable interpretation of the statute is sufficient.'" *Smith v. Rogers Galvanizing Co.,* 128 F.3d at 1383–84 (citing *Lawrence v. Jackson Mack Sales, Inc.,* 837 F.Supp. 771, 782 (S.D.Miss.1992), *aff'd,* 955 F.2d 1574 (11th Cir.1992) ("courts have generally validated methods of notice which are calculated to reach the beneficiary"); *see also* H.R.Rep. No. 453, 99th Cong., 1st Sess. 563 (pending promulgation of regulations defining what will constitute adequate notice, "employers are required to operate in good faith compliance with a reasonable interpretation" of CO-BRA's requirements)). Courts have generally approved the employer's methods of giving notice where those methods are reasonably calculated to reach the employee. For example, employers have been found in compliance with section 1166(a) when they send CO-BRA notices via first class mail to the last-known address of an employee. *See Myers v. King's Daughters Clinic,* 912 F.Supp. 233, 236 (W.D.Tex.), *aff'd,* 96 F.3d 1445 (5th Cir.1996) (citing *Truesdale v. Pacific Holding Co./Hay Adams Div.,* 778 F.Supp. 77, 81–82 (D.D.C. 1991)).

The compulsory character of COBRA's notification requirement has been repeatedly upheld by federal courts, even where the qualified beneficiary had received the initial COBRA notice at the commencement of his/her coverage, or where the employee had personal knowledge of his/her COBRA rights. *See Mlsna v. Unitel Communications, Inc.,* 41 F.3d 1124, 1129 (7th Cir.1994). Even where the former employee's duties during employment included the distribution of COBRA notices, as would have been the case with Torres, the employer is not excused from providing that employee with the required COBRA notice. *Id.* at 1130. "The fact that [a plaintiff] was given notice of [her] COBRA rights at the commencement of [her] insurance plan . . ., in no way relieves the plan administrator of the second round of notice obligations under [COBRA] after a qualifying event . . . [Plaintiff's] personal knowledge of [her] COBRA rights likewise does not nullify the administrator's statutory duty to give notice upon termination." *Phillips v. Riverside, Inc.,* 796 F.Supp. at 409.

*Torres–Negron,* 203 F.Supp.2d at 124–125.

### 1. Actual Damages

Plaintiff seeks actual damages in the amount of $16,984.27. This amount was

calculated by Plaintiff by totaling medical bills incurred during the 18–month CO-BRA period and reducing the total amount by Plaintiff's unpaid insurance premiums. It is unclear whether Plaintiff has further reduced the amount to account for deductibles which would apply as to the insurance coverage and, if so, whether the reductions have been appropriate under the coverage language. *See Jones v. Officemax, Inc.,* 38 F.Supp.2d 957, 960 (D.Utah 1999) (permitting award of medical expenses only after subtraction of deductibles and premiums); *Chenoweth v. Wal–Mart Stores, Inc.,* 159 F.Supp.2d 1032, 1042 (S.D.Ohio 2001) (same). Defendant has also raised other coverage issues-*i.e.,* whether some of the health care in question was medically necessary such that the COBRA insurance would have covered these expenses. *See, e.g., Dowden v. Blue Cross & Blue Shield of Texas, Inc.,* 126 F.3d 641, 644 (5th Cir. 1997) (affirming an ERISA benefit determination that medical expenses were not medically necessary and, therefore, not covered expenses) and cases cited therein.

■ Defendant has also asserted two other defenses. Defendant argues that Plaintiff has applied for payment of these expenses in a worker's compensation suit such that payment in this suit might cause a double recovery and windfall. This argument is not persuasive in this context. First of all, it is speculative at this point in time. Second, the federal courts, which are duty-bound to enforce COBRA, have frowned on such "windfall" arguments in COBRA cases. The reason is obvious. The employee is paying for the additional insurance and the additional coverage is, typically, not a windfall precisely because the employee's claim to it is supported by premium payments establishing a contract between knowing parties. *See Geissal v. Moore Medical Corp.,* 524 U.S. 74, 84, 118 S.Ct. 1869, 141 L.Ed.2d 64 (1998) (stating "[n]or does a beneficiary's decision to take

advantage of another group policy not previously in effect carry any indicia of the sort of windfall Congress presumably would have disapproved. Since the beneficiary has to pay for whatever COBRA coverage he obtains, there is no reason to assume that he will make an election for coverage he does not need, whether he is covered by another policy in place before the qualifying event or one obtained after it but before his election."); *Lutheran Hosp. of Indiana, Inc. v. Business Men's Assur. Co. of America,* 51 F.3d 1308, 1315 (7th Cir.1995) (stating "[t]his whole morass [referring to actuarial evidence] can be avoided by honoring the language of the statute and the decision of the insured as to how much coverage is adequate for her own situation. Under a proper application of the statute, the employee obtains no windfall. She is only allowed to preserve the level of coverage she determined was appropriate before her termination and was willing to pay to continue afterward.") Therefore, the Court rejects this defense as lacking a sound foundation in either law or fact.

■ However, Defendant's argument as to duty to mitigate is persuasive. Plaintiff, by virtue of Defendant's offer, has been given an opportunity to insure the COBRA medical expenses retroactively. Should she accept that offer, the medical expenses, if covered, will be paid and she will not incur a loss. Should she decline the offer, the decision would constitute a failure to mitigate damages which would make her ineligible to recover the medical expenses as actual damages. *See Hamilton v. Mecca Inc.,* 930 F.Supp. 1540, 1555 (S.D.Ga.1996) (stating that a plaintiff in a COBRA case has a duty to mitigate damages provided that the damages can be avoided without undue risk, burden or humiliation).[4] In either case, then, the offer prevents Plaintiff's recovery of the medical expenses as actual damages.

4. In the *Hamilton* case, the district court found that the purchase of a different continu-

■ However, while this Court accepts Defendant's argument that medical expenses incurred should not be reimbursed as actual damages, the Court will require one additional condition of Defendant to satisfy the purpose and intent of COBRA. COBRA permits an employee a 60 day period to elect coverage. *See* 29 U.S.C. § 1162(3). In this case, the notice of the offer given by Defendant was ambiguous and failed to explain the terms of payment (that it would consist of payment of monthly premiums according to a standard schedule), the terms of insurability (that Plaintiff could not be denied coverage), and the terms of coverage (that standard terms of coverage would apply). Because of these ambiguities, the Court will require Defendant to re-extend the COBRA offer with clarifying language for an additional 60 day period. The Court has authority to fashion this equitable remedy under 29 U.S.C. § 1132(c)(1). *See Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir.2001) (holding that the reinstatement of the right to an election of benefits may be an appropriate equitable remedy under 29 U.S.C. § 1132(a)(3)).[5]

This equitable remedy also works to the advantage of both of the parties. This is particularly so because it avoids difficult and protracted litigation (including discovery and evidentiary hearing) over the issue of covered medical expenses under two separate insurance policies. Plaintiff will have the benefit, should she elect it, to prompt coverage and payment of medical claims. Defendant will have the benefit of the resolution of time-consuming legal issues in a case in which Defendant is required, statutorily, to finance reasonable attorney services of Plaintiff. This resolution also works to the advantage of the Court-which does not intend to waste public resources for the resolution of manifold and mundane coverage issues when those issues can be resolved privately through ordinary claim procedures.

### 2. Statutory Damages

As stated above, Plaintiff seeks $110 per day for the statutory violation. Defendants urge that no statutory damages be assessed because of the lack of bad faith in committing the violation—*i.e.*, it mistakenly relied on its Employee Handbook instead of sending the required notice. Plaintiff believes that this conduct evidences bad faith and that it is appropriate to award the maximum amount of statutory damages since she has suffered prejudice, including foregone treatments for serious mental illness and other conditions.

■ Of course, as recognized by COBRA, the assessment of statutory damages is discretionary and depends in large part on an assessment of pertinent factors including employer bad faith and prejudice to the employee. *See Bartling v. Fruehauf Corp.*, 29 F.3d 1062 (6th Cir.1994); *Burgess v. Adams Tool & Eng'g, Inc.*, 908 F.Supp. 473, 478–79 (W.D.Mich.1995). The whole intent of this discretion is, while avoiding Draconian justice, to construct a remedy which regards the violation with sufficient seriousness that it will not be repeated.

---

ation policy which was available only at a higher premium constituted an undue burden such that the defense did not apply. In this case, the policy is the employer's standard policy and is being offered at the regular premium levels.

**5.** The *Griggs* holding concerned section 1132(a)(3) which is an ERISA enforcement mechanism limited to classical equitable remedies. Since section 1132(c)(1) cedes even broader authority (given its language—"such other relief as [the court] deems proper") to the district courts, it certainly allows the use of equitable remedies for the purpose of providing the continuation of health coverage contemplated by COBRA.

■ In the instant manner, the Court finds that the statutory violation was committed in bad faith because no reasonable interpretation of the statutory language would permit one to believe that a notice in a plan document (or worse in an employee handbook) satisfied the notification requirement triggered by the employee separation. Therefore, the Court finds that the *Bartling* and *Burgess* cases, in which minimal statutory damages were awarded because of evidence of good faith and absence of prejudice, are inapposite since this case involves both bad faith and prejudice to the employee (*i.e.*, foregone health care treatments).

■ Nevertheless, such cases as the *Torres Negron* case (in which a similar violation resulted in statutory damages of $45 per day) make clear that statutory damages are truly discretionary and that the Court need not award the maximum amount of statutory damages for each violation. *See also Garred v. General Am. Life Ins. Co.,* 774 F.Supp. 1190, 1201 (W.D.Ark.1991) (awarding $50 per day for corporation's bad faith conduct); *Thomas v. Jeep–Eagle Corp.,* 746 F.Supp. 863, 864 (E.D.Wis.1990) (awarding $50 per day for corporation's bad faith conduct). In this case, the deterrent purposes of COBRA would be sufficiently served by setting statutory damages at a rate of $55 per day, especially considering the size and fortune of the Defendant company. Therefore, the Court concludes that statutory damages should be assessed at a rate of $55 per day, for a total award of $27,610.00.

### 3. Attorney Fees and Costs

Plaintiff seeks costs in the amount of $229.25. This amount is not disputed and will be duly awarded.

Plaintiff seeks attorney fees in the amount of $32,177.00 plus an unspecified multiplier due to the fact that case was taken on a contingency. The calculation represents some 158.2 hours of attorney work at an average hourly rate in excess of $200 per hour. Plaintiff's lead attorney Martha Atwater, who is responsible for the bulk of the hours billed, billed at rates of $215 and $230 per hour during the litigation (*i.e.,* her rates increased during the course of the suit). The billed time also includes time for less experienced attorneys who prepared litigation documents and research as well as time for more experienced attorneys who provided counsel and assistance. Defendant challenges both the rates charged and the hours expended as unreasonably large.

■ Before discussing the "how much," though, the Court must decide the "whether." That is, the parties dispute whether attorney fees should be awarded at all pursuant to 29 U.S.C. § 1132(g). The statute in question clothes this Court in discretion in deciding whether to award fees and the amount of those fees. *See Sec'y of Dept. of Labor v. King,* 775 F.2d 666, 669 (6th Cir.1985); *Schwartz v. Gregori,* 160 F.3d 1116, 1119 (6th Cir.1998); *Maurer v. Joy Techs., Inc.,* 212 F.3d 907, 919 (6th Cir.2000). The factors pertinent to this analysis are:

(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*King,* 775 F.2d at 669.

■ In the instant case, those factors absolutely support the award of attorney fees. The failure to give any kind of COBRA notification at the time of separation

(and to make it official company policy that no COBRA notification would occur) bespeaks either blatant disregard for the law or extreme recklessness not appropriate to a modern business nor the realities of modern commercial life. As such, it qualifies as "bad faith." Defendant, though concerned about its finances, has not expressed that it will be financially unable to satisfy a fee award. A fee award would likely deter other small business from engaging in similar misconduct. Plaintiff also maintains that she pursued this case to obtain a common benefit for participants. Whether this was Plaintiff's intent or not (the Court expects that she probably acted mostly out of self-interest), she has conferred an important common benefit on participants—*i.e.*, she has forced her former employer into general COBRA compliance. Finally, the relative merits of the parties' positions strongly favor Plaintiff since Defendant has admitted its liability in this case. Therefore, the Court concludes that these factors together favor a substantial attorney fee equal to a reasonable number of attorney hours at a reasonable and customary attorney rate.

■ As to the amount of fees, the Court has examined the parties' briefing as well as the pertinent billing records and affidavits relating to the attorney fees to evaluate the attorney fee request. In assessing attorney fees under a lodestar analysis, the district court must determine an appropriate amount which fairly compensates the prevailing party, but which also avoids a windfall. *Hensley v. Eckerhart*, 461 U.S. 424, 430 n. 4, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Such fees are to be assessed taking into account "the prevailing market rates in the relevant community[.]" *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Ultimately, though, a lodestar fee determi-

nation is a matter left to the district court's discretion. *Id.*

■ To aid in determining a lodestar fee and to adjust or enhance a lodestar fee, the district court is also permitted to consult a number of factors specified in the Fifth Circuit case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Blanchard v. Bergeron*, 489 U.S. 87, 91 n. 5, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (citing with approval *Johnson* ); *see also Paschal v. Flagstar Bank*, 297 F.3d 431, 434–35 (6th Cir.2002) (same).

■ In this case, the average rate charged by Plaintiff's attorneys far exceeds the median rate for attorneys in the Grand Rapids market. The median rate for attorneys in the Grand Rapids market for the relevant time period is $150 per hour. This rate, rather than the Plaintiff's attorneys' usual rates, represents a fairer representation of the usual and customary rates for plaintiff services in COBRA suits. In light of this reduction of the hourly rate to $150 per hour, the Court declines to further reduce the number of hours billed (158.2).[6] While the Court agrees that the

---

**6.** The Court notes that Defendant has challenged the hours expended based on the argu-
ment that some of the hours billed related to

number of hours billed are ample, particularly at this early juncture in the suit, the Court also believes that the rate reduction already made is more than sufficient to result in a fair attorney fee. Thus, the Court will allow 158.2 hours of attorney service at an average hourly rate of $150 per hour, which results in attorney fees of $23,730.00.

In considering the *Johnson* factors for adjusting attorney fees, the Court finds that the balance of the *Johnson* factors do not suggest that the attorney fees should be enhanced from that determined above.[7] This lawsuit involves typical COBRA issues and does not concern either novel or complex legal issues. The suit is of the type filed by the typical plaintiffs' attorney firm based on form pleadings and without much additional legal research. Although Plaintiff's attorneys are extremely skilled attorneys, their level of competence, excellence and large fees are more suited to complex litigation than the typical matters addressed in this suit. In short, surgeons have been sent to do a butcher's work. While the case was taken on a contingent basis, in the Court's judgment, the risk of non-payment to Plaintiff's attorneys was very small given the nature of the claims and the supporting evidence. Also, given the total amount of damages at issue, any larger award would be untoward, particularly since these fees were determined after default and without prolonged litigation. As such, no adjustments will be allowed.

---

counts other than Count II. A review of the entries shows that they do relate to Count II, but that some of the legal work performed related to multiple counts, including Count II. This is to be expected in this kind of litigation; though, the Court nevertheless takes these objections into account in determining the total amount of fees due.

7. While the Court has highlighted the *Johnson* factors since they relate to enhancement, the same result would obtain under the five factor

*CONCLUSION*

For the reasons stated, Plaintiff's Application (and Corrected Application) for Default Judgment will be granted and a judgment shall entered as to Count II of the Complaint. The Partial Judgment shall award equitable relief as described above, statutory damages in the amount of $27,610.00, attorney fees in the amount of $23,730.00, and costs in the amount of $229.25. The Court will certify this partial judgment as final under Rule 54 because there is no just reason for delay, especially considering Plaintiff's expressed desire and need to finalize litigation as to Count II.

---

test mentioned in the *King* case and the nine factor test mentioned in the case of *Wood v. DAIIE*, 413 Mich. 573, 321 N.W.2d 653 (1982). Namely, the fees should be awarded in the amount determined. The Court recognizes that the *King* decision provides discretion to this Court to deny or greatly reduce attorney fees, though the Court does not believe that an analysis of the *King* factors supports such an approach, particularly given the nature of the bad faith conduct.